**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**UNION OIL COMPANY OF CALIFORNIA et al., Defendants-Appellees.**

No. 74–1574.

United States Court of Appeals,
Ninth Circuit.

Jan. 31, 1977.

Rehearing and Rehearing En Banc
Denied March 23, 1977.

John E. Lindskold, Atty., Dept. of Justice (argued), Washington, D. C., for plaintiff-appellant.

Dennis B. Goldstein, Deputy Atty. Gen., State of Cal. (argued), San Francisco, Cal., as amicus curiae for plaintiff-appellant.

David J. Wynne, Brobeck. Phleger and Harrison, George B. White (argued), San Francisco, Cal., for defendants-appellees.

Before BROWNING and WALLACE, Circuit Judges, and TURRENTINE,* District Judge.

BROWNING, Circuit Judge.

This is a quiet title action brought by the Attorney General of the United States pursuant to section 21(b) of the Geothermal Steam Act of 1970, 30 U.S.C. § 1020(b), to determine whether the mineral reservation in patents issued under the Stock-Raising Homestead Act of 1916, 43 U.S.C. § 291 *et seq.*, reserved to the United States geothermal resources underlying the patented lands. The district court held that it did not. 369 F.Supp. 1289 (N.D.Cal.1973). We reverse.

Various elements cooperate to produce geothermal power accessible for use on the surface of the earth. Magma or molten rock from the core of the earth intrudes into the earth's crust. The magma heats porous rock containing water. The water in turn is heated to temperatures as high as 500 degrees Fahrenheit. As the heated water rises to the surface through a natural vent, or well, it flashes into steam.[1]

Geothermal steam is used to produce electricity by turning generators. In recom-

---

* Honorable Howard B. Turrentine, United States District Judge, Southern District of California, sitting by designation.

1. *Reich v. Commissioner, of Internal Revenue*, 52 T.C. 700, 704–05 (1969), *aff'd,* 454 F.2d 1157 (9th Cir. 1972); H.R.Rep. No. 91–1544, 91st

mending passage of the Geothermal Steam Act of 1970, the Interior and Insular Affairs Committee of the House reported: "[G]eothermal power stands out as a potentially invaluable untapped natural resource. It becomes particularly attractive in this age of growing consciousness of environmental hazards and increasing awareness of the necessity to develop new resources to help meet the Nation's future energy requirements. The Nation's geothermal resources promise to be a relatively pollution-free source of energy, and their development should be encouraged." H.R.Rep. No. 91–1544, 91st Cong., 2d Sess., *reprinted at* 3 U.S.Code Cong. & Admin.News 5113, 5115 (1970).

Appellees are owners, or lessees of owners, of lands in an area known as "The Geysers" in Sonoma County, California. Beneath the lands are sources of geothermal steam. Appellees have developed or seek to develop wells to produce the steam for use in generating electricity. The lands were public lands, patented under the Stock-Raising Homestead Act. All patents issued under that Act are "subject to and contain a reservation to the United States of all the coal and other minerals in the lands so entered and patented, together with the right tö prospect for, mine, and remove the same." Section 9 of the Act, 43

U.S.C. § 299. The patents involved in this case contain a reservation utilizing the words of the statute.[2] The question is whether the right to produce the geothermal steam passed to the patentees or was retained by the United States under this reservation.

There is no specific reference to geothermal steam and associated resources in the language of the Act or in its legislative history. The reason is evident. Although steam from underground sources was used to generate electricity at the Larderello Field in Italy as early as 1904,[3] the commercial potential of this resource was not generally appreciated in this country for another half century. No geothermal power plants went into production in the United States until 1960.[4] Congress was not aware of geothermal power when it enacted the Stock-Raising Homestead Act in 1916; it had no specific intention either to reserve geothermal resources or to pass title to them.

It does not necessarily follow that title to geothermal resources passes to homesteader-patentees under the Act. The Act reserves to the United States "all the coal and other minerals." All of the elements of a geothermal system—magma, porous rock strata, even water itself[5]—may be classi-

---

Cong., 2d Sess., *reprinted at* 3 U.S.Code Cong. & Admin.News 5113, 5114 (1970); Brooks, *Legal Problems of the Geothermal Industry*, 6 Nat.Resources J. 511, 514–15 (1966); Barnea, *Geothermal Power*, Scientific American, Jan. 1972, at 70, 74.

2. The reservation reads:
    Excepting and reserving, however, to the United States all coal and other minerals in the lands so entered and patented, together with the right to prospect for, mine, and remove the same pursuant to the provisions and limitations of the Stock-Raising Homestead Act.
*See* 43 C.F.R. § 3814.2(a) (1976).

3. Brooks, *supra* note 1, at 512; Barnea, *supra* note 1, at 71.

4. Barnea, *supra* note 1, at 70. *See* H.R.Rep. No. 91–1544, *supra* note 1, at 5115.

5. *Hathorn v. Natural Carbonic Gas Co.,* 194 N.Y. 326, 87 N.E. 504, 508 (1909); H.R.Rep. No. 91–1544, *supra* note 1, at 5126–27 (letters from

Dep't of Interior); A. Ricketts, *American Mining Law* 64, 70 (4th ed. 1943); *Webster's Third Int'l Dictionary* 1437 (1961); 13 *The New Int'l Encyclopedia* 537 (Gilman, Peck, & Colby ed. 1913); 10 *The Americana* (1907–08) (unpaginated article on mineralogy includes water as mineral). *See* Kuntz, *The Law Relating to Oil & Gas in Wyoming,* 3 Wyo.L.J. 107, 109 (1949).

Moreover, geothermal steam has been held to be a "gas." *Reich v. Commissioner of Internal Revenue,* 52 T.C. 700, 710–11 (1969), *aff'd,* 454 F.2d 1157 (9th Cir. 1972). *See Geothermal Exploration in the First Quarter Century* 185, 187 (Geothermal Resources Council 1973) (letter from George R. Wickham, Ass't Comm'r, Dep't of Interior, July 8, 1924—natural gas is a mineral within purview of mining laws).

No one contends that water cannot be classified as mineral. Appellees argue only that the water should not be included in the term "minerals" in this statutory setting. This is basically a question of legislative intent, dealt with in detail later in the text. To the extent that the argument rests on the meaning of the word

fied as "minerals." When Congress decided in 1970 to remove the issue from controversy as to future grants of public lands, it found it unnecessary to alter the language of existing statutory "mineral" reservations. It simply provided that such reservations "shall hereafter be deemed to embrace geothermal steam and associated geothermal resources." Geothermal Steam Act of 1970, 30 U.S.C. § 1024.[6] Thus, the words of the mineral reservation in the Stock-Raising Homestead Act clearly are capable of bearing a meaning that encompasses geothermal resources.

The substantial question is whether it would further Congress's purposes to interpret the words as carrying this meaning. The Act's background, language, and legislative history offer convincing evidence that Congress's general purpose was to transfer to private ownership tracts of semi-arid public land capable of being developed by homesteaders into self-sufficient agricultural units engaged in stock raising and forage farming, but to retain subsur-

face resources, particularly mineral fuels, in public ownership for conservation and subsequent orderly disposition in the public interest. The agricultural purpose indicates the nature of the grant Congress intended to provide homesteaders via the Act; the purpose of retaining government control over mineral fuel resources indicates the nature of reservations to the United States Congress intended to include in such grants. The dual purposes of the Act would best be served by interpreting the statutory reservation to include geothermal resources.[7]

Events preceding the enactment of the Stock-Raising Homestead Act contribute to an understanding of the intended scope of the Act's mineral reservation. Prior to 1909, public lands were disposed of as either wholly mineral or wholly nonmineral in character. *United States v. Sweet,* 245 U.S. 563, 567–68, 571, 38 S.Ct. 193, 62 L.Ed. 473 (1918). This practice led to inefficiencies and abuses. In 1906 and again in 1907, President Theodore Roosevelt pointed out that some public lands were useful for both

itself, however, the government is entitled to have the ambiguity resolved in its favor under "the established rule that land grants are construed favorably to the Government, that nothing passes except what is conveyed in clear language, and that if there are doubts they are resolved for the Government, not against it." *United States v. Union Pac. R.R.,* 353 U.S. 112, 116, 77 S.Ct. 685, 687, 1 L.Ed.2d 693 (1957). *See Caldwell v. United States,* 250 U.S. 14, 20, 39 S.Ct. 397, 63 L.Ed. 816 (1919); *Southern Idaho Conf. Ass'n of Seventh Day Adventists v. United States,* 418 F.2d 411, 415 n.8 (9th Cir. 1969).

Appellees argue that the term "minerals" is to be given the meaning it had in the mining industry at the time the Act was adopted, and that this understanding excluded water. This is a minority rule, *United States v. Isbell Constr. Co.,* 78 Interior Dec. 385, 390–91 (1971), even as applied to permit conveyances. 1 American Law of Mining § 3.26, at 551–53 (1976).

6. Members of the Subcommittee on Mines and Mining of the House Committee on Interior and Insular Affairs went to some lengths to make it clear that whether the term "minerals" as used in prior legislation included geothermal resources was a question for the courts, on which the official position of the 89th Congress was one of neutrality. *See* Hearings on H.R. 7334 *et al.* on Disposition of Geothermal Steam, 89th

Cong., 2d Sess., ser. 89–35, pt. II, at 295–96 (1966). The point made here, however, is that in fact Congress thought the term sufficiently broad to encompass such resources.

7. The Stock-Raising Homestead Act "define[s] the estates to be granted in terms of the intended use . . . . The reservation of minerals to the United States should therefore be construed by considering the purposes both of the grant and of the reservation in terms of the use intended." 1 *American Law of Mining* § 3.26, at 552 (1976). *Accord, United States v. Isbell Constr. Co.,* 78 Interior Dec. 385, 390 (1971). *See also United States v. Union Pac. R.R.,* 353 U.S. 112, 77 S.Ct. 685, 1 L.Ed.2d 693 (1957); *Caldwell v. United States,* 250 U.S. 14, 21, 39 S.Ct. 397, 63 L.Ed. 816 (1919).

A similar approach has been taken in construing grants and reservations in deeds between private parties involving minerals. *See, e. g., Northern Natural Gas Co. v. Grounds,* 441 F.2d 704, 714 (10th Cir. 1971); *Acker v. Guinn,* 464 S.W.2d 348, 352 (Tex.1971). The "general intent [of the parties] should be arrived at, not by defining and re-defining the terms used, but by considering the *purposes* of the grant or reservation in terms of manner of enjoyment intended in the ensuing interests." Kuntz, *The Law Relating to Oil & Gas in Wyoming,* 3 Wyo.L.J. 107, 112 (1949) (emphasis in original).

agriculture and production of subsurface fuels, and that these two uses could best be served by separate disposition of the right to utilize the same land for each purpose. The President called the attention of Congress "to the importance of conserving the supplies of mineral fuels still belonging to the Government." 41 Cong.Rec. 2806 (1907). To that end, the President recommended "enactment of such legislation as would provide for title to and development of the surface land as separate and distinct from the right to the underlying mineral fuels in regions where these may occur, and the disposal of these mineral fuels under a leasing system on conditions which would inure to the benefit of the public as a whole." Id.[8]

In 1909 the Secretary of the Interior returned to the same theme, arguing that "inducements for much of the crime and fraud, both constructive and actual, committed under the present system can be prevented by separating the right to mine from the title to the soil. The surface would thereby be open to entry under other laws according to its character and subject to the right to extract the coal. The object to be attained in any such legislation is to conserve the coal deposits as a public utility and to prevent monopoly or extortion in their disposition." 1909 Dep't Interior Ann. Rep. pt. I, at 7 (emphasis omitted).[9] The Secretary made the same suggestion with respect to "oil and gas fields in the public domain." Id.

In the same year "Congress deviated from its established policy of disposing of public lands under the nonmineral land laws only if they were classified as nonmineral in character and enacted the first of several statutes providing for the sale of lands with the reservation to the United States of certain specified minerals. These statutes were soon followed by statutes providing for the sale of lands with the reservation to the United States of all minerals. . . ." 1 American Law of Mining § 3.23, at 532 (1976).

The first of these statutes "separating the surface right from the right to the underlying minerals" was the Act of March 3, 1909 (35 Stat. 844), 30 U.S.C. § 81, followed shortly by the Acts of June 22, 1910 (36 Stat. 583), 30 U.S.C. §§ 83 et seq., April 30, 1912 (37 Stat. 105), 30 U.S.C. § 90, and August 24, 1912 (37 Stat. 496). See The Classification of the Public Lands, 537 U.S. Geological Survey Bull. 45, Department of Interior (1913). In the latter report, the Geological Survey pointed out that where lands were valuable for two uses, both uses

---

8. The President said:

If this Government sells its remaining fuel lands they pass out of its future control. If it now leases them we retain control, and a future Congress will be at liberty to decide whether it will continue or change this policy. Meanwhile, the Government can inaugurate a system which will encourage the separate and independent development of the surface lands for agricultural purposes and the extraction of the mineral fuels in such manner as will best meet the needs of the people and best facilitate the development of manufacturing industries.

41 Cong.Rec. 2806 (1907).

Appellees argue that the executive department statement preceding the enactment of the Stock-Raising Homestead Act dealt primarily with coal deposits. But the concern of the statements was with the conservation of underground energy sources, as the President's references to "fuel lands" and "mineral fuels" illustrate.

9. See also id. at 57–58, and the following at 178:

No principle is more fundamental to real conservation and at the same time more beneficial to the mining and other industries than this of giving preference to the highest possible use for the public lands. The earliest land laws, those of a century ago, provided for the reservation of mineral lands from disposal for other purposes, and the present coal-land law expresses this principle of relative worth by giving gold, silver, and copper deposits priority over the coal, and coal in turn preference over agricultural values. With classification data at hand the principle of relative worth can be further developed. Wherever the different values conflict the higher use should prevail. On the other hand, wherever the different values can be separated that separation by appropriate legislation is at once the easiest and best solution of the problem; for instance, the surface rights may be separated from the right to mine underlying beds of coal.

could be served by "a separation of estates." The report urged adoption of legislation embodying "the extension of the principle of the separation of estates," plus the leasing of natural resources, as means of protecting such resources without delaying agricultural development.[10]

In 1914, within a year of this appeal, Congress began consideration of a forerunner of the Stock-Raising Homestead Act. The bill was referred to the Department of Interior for comment, revised by the Department, and reintroduced. H.R.Rep. No. 626, 63d Cong., 2d Sess., *reprinted at* 52 Cong.Rec. 3986–90 (1915). It was enacted into law the following year.

This background supports the conclusion, confirmed by the language of the Stock-Raising Homestead Act, the Committee reports, and the floor debate, that when Congress imposed a mineral reservation upon the Act's land grants, it meant to implement the principle urged by the Department of Interior and retain governmental control of subsurface fuel sources, appropriate for purposes other than stock raising or forage farming.[11]

We turn to the statutory language. The title of the Act—"The Stock-Raising Homestead Act"—reflects the nature of the intended grant. The Act applies only to areas designated by the Secretary of Interior

---

10. The report states (45–47):

The carrying out of the withdrawal policy for protecting the mineral and water resources of the public domain is in many cases rendered difficult and embarrassing by the agricultural value of the land withdrawn. . . . [S]ome of the best farming lands in the West are underlain by coal or phosphate, and some are so situated as to be of strategic importance in power development. Any hindrance to bona fide home building or other agricultural development of the public domain is indeed unfortunate, but in order to protect the public's natural resources withdrawals resulting in such hindrance have been necessary. For certain lands the situation has been relieved by the passage of acts separating the surface right from the right to the underlying minerals. . . .

In carrying out its function of classifying the public lands and in making its fund of information available in the administration of the existing land laws the Geological Survey has become acutely cognizant of the need for certain new legislation. The laws desired are primarily of two types and embody two fundamental necessities—first, the extension of the principle of the separation of estates, and second, the application of the leasing principle to the disposition of natural resources.

As has already been pointed out, the public lands can not be divided into classes each of which is valuable for one purpose only. Instead, the same tract of land may be valuable for two or more resources. In one tract—for example, agricultural land that is underlain by coal—both resources may be utilized at the same time without interfering with each other. In another tract—for example, agricultural land within a reservoir site—the land may be valuable for one resource only until it is utilized for another. In the first case the problem is so to frame the laws that no resource will be forced to await the development of the other. In the second case the problem is to permit the use of the land for one purpose pending its use for another without losing public control of the development of the second. In both cases the answer is found in a separation of estates. The extension of this principle, now applied to coal, to withdrawn and classified minerals and to the uses of water resources would permit the retention of the mineral deposits and power and reservoir sites in public ownership pending appropriate legislation by Congress without in any way retarding agricultural development. Bills have already been introduced applying this principle to oil in other States than Utah and to phosphate in the State of Idaho. It is to be hoped that such bills will be passed and approved, or, better still, that a comprehensive act providing for the separation of the various estates will be introduced and enacted.

11. The court in *Skeen v. Lynch,* 48 F.2d 1044, 1046 (10th Cir. 1931) stated:

The legislative history of the Stock-Raising Homestead Act when it was reported for passage including the discussion that followed relevant to this subject leave us no room to doubt that it was the purpose of Congress in the use of the phrase "all coal and other minerals" to segregate the two estates, the surface for stockraising and agricultural purposes from the mineral estate, and to grant the former to entrymen and to reserve all of the latter to the United States.

Although the Supreme Court of New Mexico specifically rejected the *Skeen* analysis in *State ex rel. State Highway Comm'n v. Trujillo,* 82 N.M. 694, 487 P.2d 122, 125 (1971), it did so in reliance upon the absence of an express provision in the Act, especially rejecting an invitation to examine the legislative history.

as "stock-raising lands"; that is, "lands the surface of which is, in his opinion, chiefly valuable for grazing and raising forage crops, do not contain merchantable timber, are not susceptible of irrigation from any known source of water supply, and are of such character that six hundred and forty acres are reasonably required for the support of a family. . . ." 43 U.S.C. § 292. The entryman is required to make improvements to increase the value of the entry "for stock-raising purposes." *Id.* § 293. On the other hand, "all entries made and patents issued" under the Act must "contain a reservation to the United States of all the coal and other minerals in the lands," and such deposits "shall be subject to disposal by the United States in accordance with the provisions of the coal and mineral land laws." *Id.* § 299. The subsurface estate is dominant; the interest of the homesteader is subject to the right of the owner of reserved mineral deposits to "reenter and occupy so much of the surface" as reasonably necessary to remove the minerals, on payment of damages to crops or improvements. *Id.*

The same themes are explicit in the reports of the House and Senate committees. The purpose of the Act is to restore the grazing capacity and hence the meat-producing capacity of semi-arid lands of the west and to furnish homes for the people, while preserving to the United States underlying mineral deposits for conservation and disposition under laws appropriate to that purpose. The report of the House Committee reproduces a letter from the Department of Interior endorsing the bill. The Department notes that "all mineral[s] within the lands are reserved to the United States." H.R.Rep. No. 35, 64th Cong., 1st Sess. 5 (1916). The Department continues, "To issue unconditional patents for these comparatively large entries under the homestead laws might withdraw immense areas from prospecting and mineral development, and without such a reservation the

disposition of these lands in the mineral country under agricultural laws would be of doubtful advisability." *Id.* Moreover, "[t]he farmer-stockman is not seeking and does not desire the minerals, his experience and efforts being in the line of stock raising and farming, which operations can be carried on without being materially interfered with by the reservation of minerals and the prospecting for and removal of same from the land." *Id.* This language is quoted with approval in S.Rep. No. 348, 64th Cong., 1st Sess. 2 (1916).

Commenting upon the mineral reservation, the House report states:

> It appeared to your committee that many hundreds of thousands of acres of the lands of the character designated under this bill contain coal and other minerals, the surface of which is valuable for stock-raising purposes. The purpose of [the provision reserving minerals] is to limit the operation of this bill strictly to the surface of the lands described and to reserve to the United States the ownership and right to dispose of all minerals underlying the surface thereof. . . .

H.R.Rep. No. 35, *supra*, at 18.

The floor debate is revealing. The bill drew opposition because of the large acreage to be given each patentee. *See, e. g.*, 52 Cong.Rec. 1808–09 (1915) (remarks of Rep. Stafford). In response, supporters emphasized the limited purpose and character of the grant. They pointed out that because the public lands involved were semi-arid, an area of 640 acres was required to support the homesteader and his family by raising livestock. *E. g., id.* at 1807, 1811–12 (remarks of Reps. Fergusson, Martin and Lenroot). They also pointed out that the grant was limited to the surface estate,[12] and they emphasized in the strongest terms that all minerals were retained by the United States.

For example, asked whether the reservation would include oil, Congressman Ferris,

---

**12.** Representative Burke, explaining the earlier and, for our purposes, identical version of the Act (*see* 53 Cong.Rec. 1170 (1916)), stated that "Section 2 of the bill . . . limits the entry to the surface and provides that the land must be chiefly valuable for grazing and raising forage crops . . . ." 52 Cong.Rec. 1809 (1915).

manager of the bill, responded, "It would. We believe it would cover every kind of mineral. All kinds of minerals are reserved . . . . [The bill] merely gives the settler who is possessed of any pluck an opportunity to go out and take 640 acres and make a home there." 53 Cong.Rec. 1171 (1916). It was pointed out that oil was not, technically, a "mineral." Congressman Ferris replied, "if the gentleman thinks there is any conceivable doubt about it we will put it in, because not a single gentleman from the West who has been urging this legislation wants anybody to be allowed to homestead mineral land." Id. During the closing debate on the Conference report, reference was twice made to the Department of Interior communication quoted above—including the assertion that without a broad mineral reservation the grant would be unjustifiable, and the representation that "the farmer-stockman is not seeking and does not desire the minerals, his experience and efforts being in the line of stock raising and farming, which operations can be carried on without being materially interfered with by the reservation of minerals and the prospecting for and removal of same from the land." 54 Cong.Rec. 682, 684 (1916).

There is little in the debates to comfort appellees. Appellees cite a discussion between Congressmen Mondell and Ferris, in which Mondell objected to Ferris's describing certain laws as "surface-entry laws, for they are not." Congressman Mondell continued, "They convey fee titles. They give the owner much more than the surface, they give him all except the body of the reserved mineral." 53 Cong.Rec. 1233–34

(1916).[13] Representative Mondell was not referring to the Stock-Raising Homestead Act at all, but to three earlier statutes that reserved only particularly named substances, and not minerals generally.[14] Representative Mondell opposed the Stock-Raising Homestead Act's general mineral reservation for the very reason that it restricted the patentee's estate more than the earlier statutes, and to an extent Representative Mondell thought undesirable. Congressman Mondell remarked that the general reservation contained in the Act as adopted rested on "the monarchical theory" which, he asserted, "is to reserve all minerals to the crown, upon the theory that the mere subject is not entitled to anything except the soil that he stirs." 51 Cong.Rec. 10494 (1914).[15] Although Representative Mondell eventually voted for the Act, he continued to protest the scope of the mineral reservation. His closing comment is worthy of notice. It confirms the view that the mineral reservation in the Stock-Raising Homestead Act was novel in its breadth. It also reveals that this broad reservation of subsurface resources was included at the insistence of the Department of Interior because of the large surface acreage granted under the Act:

. . . the fact should be emphasized that the bill establishes a new method and theory with regard to minerals in the land legislation in our country. It reverts back to the ancient doctrine of the ownership of the mineral by the king or the crown and reserves specifically everything that is mineral in all the land entered. It was, it was claimed, necessary to accept a provision of that kind in order

13. Appellees also observe that the proviso to the mineral reservation in the Act originally stated that "patents issued for the coal or other mineral deposits herein reserved shall contain appropriate notations declaring them to be subject to the provisions of this act with reference to the disposition, occupancy, and use *of the surface* of the land," (italics added) and that the italicized phrase was stricken in the House. 53 Cong.Rec. 1233 (1916). The change was made by committee amendment, adopted without explanation or discussion. Even considered alone, its effect is unclear. It may have been thought, for example, that the stricken phrase might be construed to render the broad mineral reservation of the Act inapplicable to patents for a particular mineral, thus inadvertently broadening the mineral grant.

14. Act of Mar. 3, 1909, 35 Stat. 844, 30 U.S.C. § 81 (coal); Act of June 22, 1910, 36 Stat. 583, 30 U.S.C. §§ 83 et seq. (coal); Act of July 17, 1914, 38 Stat. 509, 30 U.S.C. §§ 121 et seq. (phosphate, nitrate, potash, oil, gas, or asphaltic minerals).

15. See also 52 Cong.Rec. 1809 (1915).

to secure the larger acreage. The Interior Department insisted upon it, and many supported that view. My own opinion is that that policy is not wise and that in the long run it will be found to be infinitely more harmful than beneficial or useful or helpful to anyone, either the individual or the public generally. When one takes into consideration the wide range of substances classed as mineral, the actual ownership under a complete mineral reservation becomes a doubtful question.

54 Cong.Rec. 687 (1916).[16]

Appellees argue that references in the Congressional Record to homesteaders' drilling wells and developing springs [17] indicate that Congress intended title to underground water to pass to patentees under the Act. These references are not to the development of geothermal resources. As we have seen, commercial development of such resources was not contemplated in this country when the Stock-Raising Homestead Act was passed. Moreover, in context, the references are to the development of a source of fresh water for the use of livestock, not to the tapping of underground sources of energy for use in generating electricity.[18]

■ This review of the legislative history demonstrates that the purposes of the Act were to provide homesteaders with a portion of the public domain sufficient to enable them to support their families by raising livestock, and to reserve unrelated subsurface resources, particularly energy sources, for separate disposition. This is not to say that patentees under the Act were granted no more than a permit to graze livestock, as under the Taylor-Grazing Act, 43 U.S.C. §§ 315 *et seq.* To the contrary, a patentee under the Stock-Raising Homestead Act receives title to all rights in the land not reserved. It does mean, however, that the mineral reservation is to be read broadly in light of the agricultural purpose of the grant itself, and in light of Congress's equally clear purpose to retain subsurface resources, particularly sources of energy, for separate disposition and development in the public interest. Geothermal resources contribute nothing to the capacity of the surface estate to sustain livestock. They are depletable subsurface reservoirs of energy, akin to deposits of coal and oil, which it was the particular objective of the reservation clause to retain in public ownership. The purposes of the Act will be served by including geothermal resources in the statute's reservation of "all the coal and other minerals." Since the words employed are broad enough to encompass this result, the Act should be so interpreted.

■ Appellees assert that the Department of Interior has expressed the opinion that the mineral reservation in the Act does not include geothermal resources, and that this administrative interpretation is entitled to deference under *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), and similar authority. The documents upon which appellees rely do not reflect a contemporaneous construction by administrators who participated in drafting the Act to which courts give great weight

---

**16.** Congressman Raker also linked the size of the surface grant with the breadth of the reservation of sub-surface resources. 52 Cong.Rec. (App.) 521 (1915).

**17.** 52 Cong.Rec. 1810 (1915); 52 Cong.Rec. (App.) 521 (1915); 53 Cong.Rec. 1127, 1170 (1916).

**18.** "A fair and reasonable [ruling] would hold the surface owner to be entitled only to fresh waters that reasonably serve and give value to his surface ownership. Salt water and geothermal steam and brines should be held the property of the mineral owner who owns such substances as oil, gas and coal, since the functions and values are more closely related. Geothermal steam is a source of energy just as fossil fuels such as oil, gas and coal are sources of energy." Olpin, *The Law of Geothermal Resources,* 14 Rocky Mountain Mineral Law Institute 123, 140–41 (1968). *See Reich v. Commissioner of Internal Revenue,* 52 T.C. 700 (1969), *aff'd,* 454 F.2d 1157 (9th Cir. 1972); Allen, *Legal and Policy Aspects of Geothermal Resources Development,* 8 Water Resources Bull. 250, 253–54 (1972).

in interpreting statutes.[19] Nor is this a case in which Congress has approved an administrative interpretation, explicitly or implicitly.[20] On the contrary, Congress noted the Department of Interior's interpretation, observed that a contrary view had been expressed, concluded that "the opinion of the Department is not a conclusive determination of the legal question . . .," and provided for "an early judicial determination of this question (upon which the committee takes no position)." H.R.Rep. No. 91–1544, 91st Cong., 2d Sess., *reprinted at* 3 U.S.Code Cong. & Admin.News 5113, 5119 (1970).

Appellees contend that enactment of the Underground Water Reclamation Act of 1919, 43 U.S.C. §§ 351 *et seq.*, three years after passage of the Stock-Raising Homestead Act, indicates that Congress did not consider subsurface water to be a "mineral." We disagree; indeed the more reasonable implication seems to us to be to the contrary.[21]

**19.** *Zuber v. Allen,* 396 U.S. 168, 193, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969); *Power Reactor Dev. Co. v. International Union of Electrical, Radio & Machine Workers,* 367 U.S. 396, 408, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961); *United States v. American Trucking Ass'ns,* 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940).

Appellees rely upon three letters by officials of the Department of Interior stating that "geothermal steam" is not a "mineral" within the meaning of the mining laws or the mineral reservation. Two of the letters, both dated Dec. 16, 1965, are responses by Edward Weinberg, Deputy Solicitor, to letters of inquiry from interested citizens. They are reproduced in an appendix to the district court's opinion, 369 F.Supp. at 1300–02, and as part of H.R. Rep. No. 91–1544, *supra* note 1, at 5126–28. The third letter was written by the Associate Solicitor for Public Lands to counsel for appellee Magma Power Company on Feb. 16, 1966, and apparently has not been published.

The letters do not reflect an agency view contemporaneous with the passage of the Act—they were written a half century after the statute was adopted. Appellees also rely upon a Department of Interior memorandum from Edward Fischer, Acting Solicitor, to the Director of Bureau of Land Management, stating that geothermal steam is not a "mineral material" for the purposes of the Mineral Act of 1947, 30 U.S.C. § 601. Dep't Interior Mem. M–36625, Aug. 18, 1961. But this view is contrary to that expressed by Solicitor Stevens only seven months earlier in a letter to appellee Magma Power Company dated Jan. 19, 1961. Brooks, *supra* note 1, at 524 & n.56; Note, *Acquisition of Geothermal Rights,* 1 Idaho L.Rev. 49, 56 & n.44 (1964). This inconsistency, *see* Hearings on H.R. 7334 *et al.* before the Subcomm. on Mines & Mining of the House Comm. on Interior and Insular Affairs, 89th Cong., 2d Sess., ser. 89–35, pt. II, at 194–95 (1966) (statement of Emmet Wolter) is another factor indicating that we should not accord deference to the administrative construction. *See Udall v. Tallman,* 380 U.S. 1, 17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

Moreover, the expressions of opinion relied upon by appellees are weakly reasoned. They rest entirely upon the premise that geothermal resources are simply water. Water, the argument then proceeds, ordinarily is not included in mineral reservations by the courts, or treated as a mineral in public land laws. But all of the court decisions relied upon in the communications concern fresh water brought to the surface by means of a well. *See Mack Oil Co. v. Laurence,* 389 P.2d 955 (Okl.1964); *Fleming Foundation v. Texaco,* 337 S.W.2d 846 (Tex. Civ.App.1960). *See Estate of Genevra O'Brien,* 8 Oil & Gas 845 (N.D.Tex.1957) (charge of the court). And if geothermal resources are indeed "water," the later enactment of the Geothermal Steam Act has undercut the statement that "water" is not treated as a mineral in public land laws. But the principle deficiency in the documents relied upon by appellees is this: the sole question is the meaning of the statute; the answer therefore turns entirely upon the intent of Congress, and the documents do not mention that subject at all.

**20.** *See, e. g., Power Reactor Dev. Co. v. International Union of Electrical, Radio & Machine Workers,* 367 U.S. 396, 408–09, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961).

**21.** The Underground-Water Reclamation Act authorizes the issuance of permits to explore for underground water on not to exceed 2,560 acres of public lands in Nevada (§ 351). The Act provides that if a permittee discovers and makes available for use a supply of underground water in sufficient quantity "to produce at a profit agricultural crops other than native grasses upon not less than twenty acres of land," he will be entitled to a patent on 640 acres of the public land embraced in his permit (§ 355). The Act further provides for reservation of "all the coal and other valuable minerals in the lands" patented (§ 359). Appellees argue that the term "minerals" in the latter provision must not include underground water, for if it did the reservation would deprive the patentee of the very water he had discovered.

But again, the obvious distinction is between underground water suitable for agricultural purposes and geothermal resources. The purpose of the Underground-Water Reclamation

The district court granted appellees' motion to dismiss for failure to state a claim upon which relief could be granted. 369 F.Supp. at 1299. The State of California, as amicus, suggests that questions of fact are presented as to the nature of geothermal resources. We are persuaded that the facts necessary to decision are not disputed. The appeal presents only a question of law as to the proper construction of the statute, which we have answered.

Whether the United States is estopped from interfering with the rights of private lessees without compensating them for any losses they may sustain will be open on remand.

Reversed and remanded.

Act is fully realized and all of its provisions made fully effective if the term "minerals" is read to exclude the former but include the latter. As noted in the text, the significance of the Underground-Water Reclamation Act may be the opposite of that suggested by appellees when the statute is considered in conjunction with the Geothermal Steam Act of 1970, for the latter statute was adopted on the premise that existing legislation, presumably including the Underground-Water Reclamation Act of 1919, did not authorize the Department of Interior to dispose of geothermal resources in public lands. *See, e. g.,* H.R.Rep. No. 91–1544, *supra* note 1, at 5115.