John J. KALVINSKAS, Plaintiff–Counter–Defendant–Appellant,

v.

CALIFORNIA INSTITUTE OF TECHNOLOGY, Defendant–Counter–Claimant–Appellee.

No. 94–55958.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 8, 1995.

Decided Sept. 27, 1996.

Robert M. Teets, Jr. and Stephen E. Webber, Law Offices of Stephen E. Webber, Los Angeles, CA, for plaintiff-counter-defendant-appellant.

Brent R. Bohn and James A. Zapp, Paul, Hastings, Janofsky & Walker, Los Angeles, CA, for defendant-counter-claimant-appellee.

Laurie A. McCann, American Association of Retired Persons, Washington, DC, for amicus American Association of Retired Persons.

Gail S. Coleman, Equal Employment Opportunity Commission, Washington, DC, for amicus Equal Employment Opportunity Commission.

Before: BROWNING, NORRIS, and REINHARDT, Circuit Judges.

WILLIAM A. NORRIS, Circuit Judge:

This appeal requires us to interpret the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, as amended by the Older Workers Benefit Protection Act of 1990 (OWBPA), Pub.L. No. 101–433, 104 Stat. 978. At issue is the meaning of a provision in the OWBPA that permits an employer to offset long-term disability benefits with the pension benefits for which a retirement-age employee is eligible.

## I

The facts are not in dispute. Kalvinskas was employed as a research scientist at the Jet Propulsion Laboratory of the California Institute of Technology (Caltech) from 1974 to March 1990. Over the course of his 16 years of service to Caltech, Kalvinskas obtained six patents, published 16 technical papers, and received numerous awards. In March 1990, Parkinson's disease forced Kalvinskas to take medical leave from Caltech. After a six-month elimination period, he became eligible on September 1, 1990, for Long–Term Disability benefits (LTD benefits) provided by Caltech.[1] The LTD plan had a maximum LTD benefit period of 36 months. The LTD plan further provided that Kalvinskas' monthly LTD benefits would be reduced by any state disability insurance benefits, social security disability benefits, and retirement benefits paid or payable at the "normal retirement age" under Caltech's retirement plans. While on medical leave, Kalvinskas retained his status as an employee of Caltech and his right to return to work should his health improve.

Before Kalvinskas took medical leave, his monthly salary was $6682. After he took medical leave, the amount of his LTD benefits varied slightly from month to month due to changes in the amount of the state disability and social security offsets. In January 1992, Kalvinskas' monthly LTD benefits were

1. The LTD benefits were provided by Caltech through a Group Insurance Long–Term Disability Plan assigned to PM Group Life Insurance Company.

$2043. On January 14, 1992, Kalvinskas turned 65 and became eligible for retirement under the two Caltech retirement plans in which he participated. At that time, had he elected to retire, his monthly retirement benefits would have been $2061, an amount slightly more than the $2043 he was then receiving in monthly LTD benefits. Unlike pension plans that allow employees to receive pension payments while still employed, the pension plans at issue in this case required Kalvinskas to retire as a condition precedent for receipt of pension benefits. What gave rise to this litigation was Caltech's decision to offset Kalvinskas' LTD benefits by the amount of the pension benefits he could have received only by retiring, thereby reducing Kalvinskas' income stream from Caltech to zero.

On June 7, 1993, Kalvinskas sued Caltech in Los Angeles Superior Court, alleging age discrimination in violation of the California Fair Employment and Housing Act (FEHA),[2] Cal.Gov't Code §§ 12900 *et seq.*, and the ADEA. Kalvinskas sought to require Caltech to pay him his monthly $2043 in LTD benefits without reduction for retirement benefits he could receive only by retiring. Caltech cross-claimed for $10,216, the sum of five monthly LTD payments it had inadvertently paid to Kalvinskas after he turned 65 because of a delay in processing. Caltech removed the case to the district court pursuant to 28 U.S.C. § 1441(b), and the district court granted it summary judgment.[3] The district court interpreted the ADEA as expressly permitting an employer to offset long-term disability benefits with the pension benefits for which a retirement-age employee is eligible, even if the offset would require the employee to retire in order to receive the pension benefits. The district court's decision turned on its interpretation of the word "eligible," which it held to refer to the opportunity to retire, rather than the opportunity to receive pension benefits independent of retirement status. Because the district court overlooked the critical distinction between retirement status and pay status, we reverse. We hold that Caltech violated § 4(f)(2) of the ADEA, 29 U.S.C. § 623(f)(2), by offsetting Kalvinskas' disability benefits with pension benefits that he could receive only by retiring.

## II

At the outset, we emphasize that this is not a case about double-dipping. Kalvinskas acknowledges that the ADEA permits an employer to offset long-term disability benefits by the pension benefits for which an employee is "eligible," but argues that at the time of the offset he was not "eligible" for any pension benefits because he had not retired. Kalvinskas' legal theory is that by offsetting his disability benefits with pension benefits he could receive only by retiring, thereby reducing his income stream to zero, Caltech effectively coerced him into retiring on the basis of age in violation of § 4(f)(2) of the ADEA, which prohibits employee benefit plans that "require or permit the involuntary retirement of an individual." 29 U.S.C. § 623(f)(2).[4] Essentially, Kalvinskas argues

2. The district court held that Kalvinskas' FEHA claims were preempted by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 *et seq.* Because we hold that Kalvinskas is entitled to summary judgment on his ADEA claim, we need not reach the preemption question.

3. We review a summary judgment *de novo. Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir.1995), *cert. denied,* — U.S. —, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996). Summary judgment is appropriate only when, construing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.;* Fed.R.Civ.P. 56(c).

In addition to arguing on appeal that the summary judgment should be reversed on the merits, Kalvinskas argues that the district court's failure to enter a separate judgment on Caltech's counterclaim shows that its order on the counterclaim should be reversed for "clear error." We reject this argument, and note that the absence of a separate form of judgment does not defeat our jurisdiction when there has been a timely notice of appeal from a district court's final order. *Bankers Trust v. Mallis,* 435 U.S. 381, 387–88, 98 S.Ct. 1117, 1121–22, 55 L.Ed.2d 357 (1978); *United States v. Nordbrock,* 38 F.3d 440, 442 n. 1 (9th Cir.1994).

4. Section 4(f)(2) states in relevant part: "[N]o ... employee benefit plan or voluntary early retirement incentive plan shall ... require or permit the involuntary retirement of any individual ... because of the age of such individual." 29 U.S.C. § 623(f)(2). This provision prohibits a

that by reducing his income stream to zero, Caltech left him with no choice but to retire, thereby terminating his status as an employee and closing the window of opportunity to resume working at Caltech should his health improve.

We agree with Kalvinskas, as the district court did, *see* Order at 11–12, that by offsetting his LTD payments by the amount of the pension payments he could receive only by retiring, thereby reducing his income stream to zero, Caltech "require[d]" his involuntary retirement within the meaning of § 4(f)(2). Without deciding what degree of reduction in disability benefits would "require or permit the involuntary retirement of any individual" under § 4(f)(2), we hold that a reasonable person in Kalvinskas' position would feel he had no choice but to retire.[5] Thus, Caltech's LTD plan, as applied to Kalvinskas, "require[d]" his involuntary retirement within the meaning of § 4(f)(2).

Caltech attempts to avoid this conclusion by arguing that a "mere reduction" in disability payments cannot be deemed to "require" involuntary retirement under § 4(f)(2). *See* Appellees' Br. at 9–10. It attempts to distinguish, for this purpose, between a "mere reduction" in disability payments and an "absolute exclusion" from participation in a disability benefits plan. *Id.* Caltech offers no support for its distinction,[6] and we reject it. At least as applied to the facts of this case, the coercive effect on Kalvinskas would have been no greater had he been excluded from participation in the disability benefits plan altogether, than it was in fact by a "mere reduction" in his disability benefits to zero.

### III

■ Having decided that Caltech's reduction of Kalvinskas' LTD benefits "require[d]" his involuntary retirement within the meaning of § 4(f)(2), we now turn to the question whether Caltech's LTD plan was protected by a safe harbor created by § 4(*l*)(3)(B) of the ADEA, 29 U.S.C. § 623(*l*)(3)(B). Section 4(*l*)(3)(B) permits the reduction of long-term disability benefits by pension benefits "for which an individual who has attained the later of age 62 or normal retirement age is *eligible*." 29 U.S.C. § 623(*l*)(3)(B) (emphasis added).[7] Kalvinskas and amicus Equal Em-

---

specific act of age discrimination, which is generally prohibited by § 4(a) of the ADEA, 29 U.S.C. § 623(a).

**5.** The test for determining whether an employee benefits plan "require[s] or permit[s] the involuntary retirement of an individual," in violation of § 4(f)(2) is whether a reasonable person in the employee's position would feel compelled to resign under the circumstances. *See Bodnar v. Synpol, Inc.*, 843 F.2d 190, 192–93 (5th Cir.) (test for constructive discharge under ADEA is "whether a reasonable person in the employee's position would have felt compelled to resign under the circumstances"; a prima facie case of age discrimination is established when "[a]n employer's 'offer' of early retirement ... sufficiently alters the status quo"), *cert. denied*, 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988); *Henn v. National Geographic Soc'y*, 819 F.2d 824, 829 (7th Cir.) (involuntary retirement under ADEA § 4(f)(2) may be shown if employer "manipulated the options so that [the employees] were driven to early retirement not by its attractions but by the terror of the alternatives"), *cert. denied*, 484 U.S. 964, 108 S.Ct. 454, 98 L.Ed.2d 394 (1987); S.Rep. No. 263, 101st Cong., 2d Sess. 27 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1509, 1532 ("The critical question involving allegations of involuntary retirement is whether, under the circumstances, a reasonable person would have

concluded that there was no choice but to accept the offer [to retire].").

**6.** Caltech does cite *EEOC v. Westinghouse Elec. Corp.*, 925 F.2d 619, 634 (3d Cir.1991), as authority for its position, but *Westinghouse* did not distinguish between a "mere reduction" in disability benefits and an "absolute exclusion" from participation in a disability benefits plan. Rather, *Westinghouse* only addressed facts in which older workers were excluded from participation in a severance benefits plan, and held that the exclusion did not constitute involuntary retirement on the facts of the case. Therefore, *Westinghouse* never had occasion to address a "mere reduction" in benefits, nor whether a reduction in benefits could constitute a coerced involuntary retirement for purposes of § 4(f)(2).

**7.** Section (*l*)(3) states in relevant part:
(*l*) ... Notwithstanding clause (i) or (ii) of subsection (f)(2)(B) of this section—
(3) It shall not be a violation ... solely because an employer provides a bona fide employee benefit plan or plans under which long-term disability benefits received by an individual are reduced by any pension benefits (other than those attributable to employee contributions)—
(A) paid to the individual that the individual voluntarily elects to receive; or

ployment Opportunity Commission (EEOC)[8] argue that § 4(*l*)(3)(B) does not make lawful Caltech's offset of Kalvinskas' disability benefits by his pension benefits because Kalvinskas did not become "eligible" for his retirement pension within the meaning of § 4(*l*)(3)(B) simply by reaching age 65. Instead, they argue that Kalvinskas became "eligible" for his pension benefits only after he in fact retired. In contrast, Caltech argues that Kalvinskas became "eligible" within the meaning of § 4(*l*)(3)(B) when he reached age 65.

We cannot resolve the dispute between Kalvinskas and the EEOC on the one hand, and Caltech on the other, by recourse to the statutory language itself, because Congress left the word "eligible" undefined. We move on, therefore, to a consideration of the statute's legislative history and its purposes. *See United States v. van den Berg,* 5 F.3d 439, 443 (9th Cir.1993) ("Because there is no plain meaning ... that is dispositive of the disagreement between the parties, we move on to a consideration of the statute as a whole, its history, and its purposes.").

Looking at the legislative history, we find no committee report addressing the meaning of the word "eligible" in § 4(*l*)(3)(B). We do find, however, relevant statements by sponsors of the OWBPA. *See Federal Energy Admin. v. Algonquin SNG, Inc.,* 426 U.S. 548, 564, 96 S.Ct. 2295, 2304, 49 L.Ed.2d 49 (1976) (statements of sponsor deserve substantial weight); *Church of Scientology v. United States Dep't. of Justice,* 612 F.2d 417, 424 n. 13 (9th Cir.1980) (court may look to statements by initiators or sponsors of proposed legislation when meaning of words is in doubt). Senator Jeffords, a sponsor of the bill in the Senate, described § 4(*l*)(3) as a provision that "addresses the issue of double dipping by pension eligible employees who are out of work on long term disability." He explained:

> It is my understanding that agreement has been reached that these two benefits can be integrated in such a way that the *employee receives combined payments* at the level of the greater of either pension or disability. *Thus, the income stream to the employee is not decreased,* only the source of the funds is shifted.

119 Cong.Rec. S13606 (daily ed. Sept. 24, 1990) (statement of Sen. Jeffords) (emphasis added). Senator Pryor, another sponsor, also explained that § 4(*l*)(3) is a provision to "make[ ] sure that an employer does not have to *pay* an employee *both* [disability and pension] benefits *at the same time.*" 136 Cong. Rec. S13250 (daily ed. Sept. 17, 1990) (statement of Sen. Pryor) (emphasis added). Senator Pryor later reiterated, "The compromise [of § 4(*l*)(3) ] ... allows complete integration of disability with pension benefits.... This *effectively eliminates any duplicate payments.*" 136 Cong.Rec. S13604 (daily ed. Sept. 24, 1990) (statement of Sen. Pryor) (emphasis added). Finally, Representative Goodling, a floor manager of the bill in the House, echoed the Senate sponsors' interpretation of § 4(*l*)(3) by stating that the provision "[b]roadens the integration of disability and pension ... [and] largely eliminates the possibility that employers will be required to make *double payments* to individuals—for example, both pension and long term disability." 136 Cong.Rec. H8621 (daily ed. Oct. 3, 1990) (statement of Rep. Goodling) (emphasis added).

This legislative history demonstrates that the purpose of § 4(*l*)(3)(B) was to prevent an employee from receiving the windfall of simultaneous payments of long-term disability and pension benefits in full. In other words, Congress created § 4(*l*)(3)(B) to permit employers to offset disability benefits by pension benefits when necessary to avoid double payments. *See Milwaukee Prof. Fire Fighters Assoc. v. City of Milwaukee,* 869 F.Supp. 633, 647 (E.D.Wis.1994) (holding that the legislative history of the ADEA supports the view that § 4(*l*)(3)(B) was designed only to prevent double-dipping, and not to

---

> (B) for which an individual who has attained the later of age 62 or normal retirement age is eligible.

29 U.S.C. § 623(*l*)(3).

8. The EEOC filed an amicus brief based on its belief that this case raises a question of first impression whose resolution will inevitably affect the EEOC's ADEA enforcement efforts. Brief of the EEOC as Amicus Curiae at 1.

force employees to select reduced benefits). This legislative purpose sheds light on the meaning of the word "eligible" in § 4(l)(3)(B). Caltech's interpretation—that Kalvinskas was "eligible" for pension payments when he reached retirement age, even though he had no right to the payments because he had not retired—does not serve the legislative purpose of avoiding double-dipping. In contrast, Kalvinskas' and the EEOC's interpretation—that he was not "eligible" for pension payments until he retired—squares with Congress' purpose of assuring that employers are not required to make duplicate payments.

Our interpretation of the word "eligible" in § 4(l)(3)(B) is also in harmony with the other provisions of the ADEA, specifically § 4(f)(2). As we have explained, § 4(f)(2) of the ADEA expressly prohibits any employee benefit plan from "requiring or permitting involuntary retirement." 29 U.S.C. § 623(f)(2). Our interpretation of § 4(l)(3)(B) is consistent with § 4(f)(2)'s prohibition against involuntary retirement, because it does not permit an employer to coerce an employee into retiring by reducing his disability benefits with pension benefits he can receive only by retiring. Caltech's interpretation of § 4(l)(3)(B), on the other hand, brings it into tension with § 4(f)(2) because it would permit an employer to do just that. Section 4(l)(3)(B) therefore permits the offset of disability benefits by pension benefits only when the two benefits are receivable simultaneously. Because Kalvinskas could not receive his pension benefits until he retired, and because he had not retired when Caltech began reducing his disability benefits, Caltech violated the ADEA.

## CONCLUSION

In conclusion, we hold that Caltech's LTD plan, as applied to Kalvinskas, violates ADEA § 4(f)(2)'s prohibition against plans that require or permit involuntary retirement. In addition, the LTD plan is not protected by ADEA § 4(l)(3)(B)'s safe harbor for offsets of long-term disability benefits by pension benefits, because that safe harbor applies only when pension benefits are pay-

able concurrently with disability benefits.[9] The summary judgment awarded to Caltech is REVERSED and the case is REMANDED to the district court for entry of summary judgment for Kalvinskas. Attorneys fees are awarded to appellant Kalvinskas pursuant to 29 U.S.C. §§ 216(b), 626(b).

---

9. Because we hold that Caltech's LTD plan does not fall within the § 4(l)(3)(B) safe harbor, § 4(l)(3)(B) does not apply to Kalvinskas, and we need not address whether § 4(l)(3)(B) is an exception to § 4(f)(2)'s prohibition against involuntary retirement.