314 F.3d 1080
 BEDROC LIMITED, L.L.C., a Nevada Limited Liability Company, Plaintiff-Counter-Defendant-Appellant, and
Western Elite, Inc., a Nevada corporation, Plaintiff-Appellant, and
Earl Williams, an individual, Plaintiff-Counter-Defendant,
v.
The UNITED STATES of America; Gale A. Norton, Secretary of the Interior; United States Department of the Interior, Bureau of Land Management; and Curtis L. Tucker, Area Manager, Caliente Resource Area Bureau of Land Management, Defendants-Counterclaimants-Appellees.
 No. 01-17080.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted November 7, 2002.
 Filed December 30, 2002.
 
 L. Eric Lundgren, Lundgren Law Offices, P.C., Cheyenne, WY, for the plaintiffs-appellants.
 Blaine T. Welsh, Assistant United States Attorney, Environment and Natural Resources Division, Las Vegas, NV, for the defendants-appellees.
 Appeal from the United States District Court for the District of Nevada; Philip M. Pro, District Judge, Presiding. D.C. No. CV-98-01012-PMP.
 Before HAWKINS, GRABER, and TALLMAN, Circuit Judges.
 OPINION
 GRABER, Circuit Judge.
 
 
 1
 In this appeal, we must decide whether sand and gravel are "valuable minerals" within the meaning of the Pittman Underground Water Act (the Act or the Pittman Act), 43 U.S.C. §§ 351-359 (1935).[1] The now-repealed Act provided grants, or "patents," of federal public lands to people who found underground sources of water in the deserts of Nevada. Under the terms of the Act, these patents reserved "all the coal and other valuable minerals" to the United States. Pittman Act § 8.
 
 
 2
 Plaintiff BedRoc Limited[2] brought this action to quiet title in a parcel of land granted under the Act in 1940 to BedRoc's predecessor in interest. Citing the mineral reservation, the United States has claimed title to the sand and gravel on the parcel; BedRoc contends that sand and gravel are not "valuable minerals" within the meaning of the Act and thus were not reserved to the government. The district court granted summary judgment in favor of the United States. We affirm.
 
 
 3
 We hold that sand and gravel are encompassed by the reservation of "valuable minerals" to the United States. The purpose of the Act and its legislative history instruct us to construe the reservation broadly. Moreover, government documents concerning minerals, published contemporaneously with the statute's enactment, describe the then-lucrative market for sand and gravel.
 
 FACTS AND PROCEDURAL HISTORY
 A. Historical Background
 
 4
 In 1910, only 81,875 people lived in Nevada. The federal government owned most of the land in Nevada. The lack of a tax base held back development of the state's infrastructure. The Homestead Acts, a successful tool for development in other western states, had failed to populate Nevada because of the lack of water available for agricultural cultivation. 54 Cong. Rec. S706 (1916).
 
 
 5
 At the time, it was thought that the future development of the state depended largely on the discovery of underground water, which could be used to irrigate land for agricultural purposes. Nevada's congressional representatives, however, failed to gain the necessary support to fund projects to explore for underground water. Id. As an alternative, Nevada Senator Key Pittman proposed the Pittman Underground Water Act as a means of encouraging private citizens to search for underground water in order to cultivate Nevada's arid lands.
 
 
 6
 Passed in 1919, the Act provided that the Department of the Interior would certify certain "nonmineral" public lands to parcel out to prospective settlers. Pittman Act § 1. Initially, the government issued two-year permits, giving settlers the exclusive right to drill wells in a parcel of up to 2,560 acres. Id. If a settler could demonstrate successful irrigation of at least 20 acres, the United States would grant the settler a patent of up to 640 acres. Pittman Act § 5. The remaining acres would be divided into homesteads and distributed under the 160-acre Homestead Act. Pittman Act § 6.
 
 
 7
 The Act and the patents issued pursuant to the Act contain the following mineral reservation:
 
 
 8
 That all entries made and patents issued under the provisions of this Act shall be subject to and contain a reservation to the United States of all the coal and other valuable minerals in the lands so entered and patented, together with the right to prospect for, mine, and remove the same. The coal and other valuable mineral deposits in such lands shall be subject to disposal by the United States in accordance with the provisions of the coal and mineral land law in force at the time of such disposal.
 
 
 9
 Pittman Act § 8 (emphasis added).
 
 B. BedRoc's Patent
 
 10
 On March 12, 1940, Newton and Mabel Butler received a patent under the Act for 560 acres of land in Lincoln County, Nevada. "[I]n conformity with the ... Act," the patent reserved to the United States "all the coal and other valuable minerals in the lands so granted, together with the right to prospect for, mine, and remove the same upon compliance with the conditions of and subject to the limitations of Section eight of said Act."
 
 
 11
 In the early 1990s, a lessee began taking sand and gravel from the property. Earl Williams purchased the property in 1993 and continued to extract sand and gravel. The Bureau of Land Management (BLM) issued trespass notices to Williams on March 26 and April 1, 1993. Williams challenged the notices. In response, the BLM issued a decision stating that Williams' removal of the sand and gravel trespassed against the government's reserved interest in the "valuable minerals" on the property. The Interior Board of Land Appeals upheld that decision on appeal, relying on the legislative history of the Act and on the intent of Congress in enacting it. Earl Williams, 140 I.B.L.A. 295, 304-13 (1997).
 
 
 12
 BedRoc acquired the property from Williams in 1995 and continued to remove sand and gravel. Pursuant to an agreement with the Department of the Interior, BedRoc placed money in escrow from the sale of each cubic yard of sand and gravel removed, pending final resolution of the ownership dispute.
 
 C. District Court Proceedings
 
 13
 In the district court, BedRoc sought to quiet title in the sand and gravel and to determine how much of the funds in escrow should be paid to the government if the district court concluded that the mineral reservation included sand and gravel. BedRoc and the government filed cross-motions for summary judgment on the issue of ownership. The district court granted summary judgment in favor of the United States.
 
 
 14
 Before the district court resolved the remaining issues, the parties reached a settlement regarding the funds in escrow. The settlement provided that BedRoc could appeal only the ownership issues to this court. The district court entered a final judgment pursuant to the parties' stipulation, and this timely appeal followed.
 
 STANDARD OF REVIEW
 
 15
 We review de novo a grant of summary judgment. Robi v. Reed, 173 F.3d 736, 739 (9th Cir.1999). We also review de novo questions of statutory interpretation. Lopez v. Wash. Mut. Bank, 302 F.3d 900, 903 (9th Cir.2002).
 
 
 16
 "We interpret a federal statute by ascertaining the intent of Congress and by giving effect to its legislative will." Ariz. Appetito's Stores, Inc. v. Paradise Village Inv. Co. (In re Ariz. Appetito's Stores, Inc.), 893 F.2d 216, 219 (9th Cir.1990). First, we examine the statute's text. Siripongs v. Davis, 282 F.3d 755, 758 (9th Cir.2002). If the text of the statute makes Congress' intent clear, we need look no further. United States v. Romo-Romo, 246 F.3d 1272, 1275 (9th Cir.2001). "Where the language is not dispositive, we look to the congressional intent revealed in the history and purposes of the statutory scheme." United States v. Buckland, 289 F.3d 558, 565 (9th Cir.2002) (en banc) (citation and internal quotation marks omitted).
 
 DISCUSSION
 A. The Statutory Text
 
 17
 "The word `mineral' is used in so many senses, dependent upon the context, that the ordinary definitions of the dictiothrow but little light upon its signification in a given case." N. Pac. Ry. Co. v. Soderberg, 188 U.S. 526, 530, 23 S.Ct. 365, 47 L.Ed. 575 (1903). A review of the dictionary definitions of "mineral" bears out that principle. Broadly, a "mineral" includes anything that is neither animal nor vegetable. Webster's Third New Int'l Dictionary 1437 (unabridged ed.1993). Some definitions name "sand" specifically as an example of a "mineral." See, e.g., Merriam-Webster Dictionary, available at http://www.m-w.com/. But, neither the text of the statute nor dictionary definitions answer the precise question here: Did Congress intend sand and gravel to be included in the reservation of "valuable minerals" under the Pittman Act? Pittman Act § 8 (emphasis added).
 
 
 18
 The word "valuable" does not clarify the ambiguity. For purposes of statutory construction, we must determine "whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." Robinson v. Shell Oil Co., 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) (emphasis added). Although the ordinary meaning of the phrase "valuable minerals" does not evoke images of sand and gravel, neither does the phrase obviously exclude those substances. Sand and gravel are not "valuable" in the way that diamonds or gold might be. However, late-nineteenth century dictionaries confirm that "valuable" did not simply mean "precious"; as it does today, "valuable" also described an object's utility. See Joseph E. Worcester, A Dictionary of the English Language 1614 (1897) (defining "valuable" as "having value or worth; being possessed of worth or useful properties; ... useful"). In that sense, sand and gravel have value, both for their usefulness and for their commercial worth.
 
 
 19
 When the mineral reservation is read in context, the significance of the modifier "valuable" diminishes. The mineral reservation provision, section 8 of the Act, refers to minerals several times. Sometimes the modifier "valuable" is used, but at other times variants of the word "minerals" appear without qualification. For example, the statute provides that all "[t]he coal and other valuable mineral deposits in such lands shall be subject to disposal by the United States." Pittman Act § 8. However, section 8 also provides that "[a]ny person who has acquired from the United States the coal or other mineral deposits" may enter the property with the consent of the patent holder. For that phrase to make sense, the United States must already have owned "the coal or other mineral deposits." When considered in context, the modifier "valuable" does not, by itself, clearly limit the scope of minerals reserved to the United States.
 
 
 20
 In addition to containing the qualifier "valuable," the statute requires that land granted under the Act must first be certified as "nonmineral." Pittman Act § 1. BedRoc argues that this certification means that the government thought that the land contained no minerals at all and thus disclaimed any mineral deposits of which it was unaware at the time of grant. By contrast, the government asserts that, by granting patents only of lands that were "nonmineral," Congress expressed its intent to part only with the surface estate and to reserve all mineral deposits in the lands to the United States. Both interpretations are plausible; the requirement that the patented lands be designated "nonmineral" does not resolve the ambiguity.[3]
 
 
 21
 We conclude that the phrase "valuable minerals" in the Pittman Act's reservation is ambiguous. The text of the statute does not conclusively convey Congress' intent as to whether sand and gravel are included within the scope of the reservation. Because the text is unclear, we turn to a discussion of the statutory purpose, the legislative history, and other sources outside the statute to determine congressional intent.
 
 B. The Purpose of the Act
 
 22
 As stated in committee reports, the purpose of the Act was "to encourage the exploration for and development of artesian and subsurface waters in the State of Nevada." H.R.Rep. No. 66-286, at 1 (1919). The legislative purpose did not stop there, however. If water was discovered, it was meant to be put to use irrigating lands for agricultural development. Of course, part of the Act's purpose was to create an incentive for private individuals to risk time, labor, and money in prospecting for water. But this "reward" was not an end in itself. Rather, the Act granted land to water prospectors because their labor furthered the larger goal of irrigating and lands for farming.
 
 
 23
 The threshold showing required to obtain a patent proves this point: The permit holder had to demonstrate that there were "underground waters in sufficient quantity to produce at a profit agricultural crops other than native grasses upon not less than twenty acres." Pittman Act § 5. Once that prerequisite was met, the remaining area under the permit was open to entry only under the 160-acre Homestead Act. Pittman Act § 6.
 
 
 24
 In the legislative history, numerous references to Nevada's agricultural future confirm that the larger goal of the Act was to encourage the cultivation of land for agricultural purposes: "The primary object of the bill is to encourage the development of the agricultural portions of the public domain in the State of Nevada, not susceptible of irrigation from any known source of surface water supply...." H.R.Rep. No. 64-731, at 1 (1916); "The future development of the agricultural land of the State seems to depend largely upon the development of artesian water." H.R.Rep. No. 63-1418, at 2 (1915); see also S.Rep. No. 64-4, at 2 (1915) (stating same); "It is evident that the retarding of agricultural development in Nevada is due entirely to the failure of the Government to provide laws under which the land could be acquired and the waters of the State developed and conserved." H.R.Rep. No. 66-286, at 2 (1919); "The geographical situation of the State of Nevada, the absence of large streams or other large bodies of surface waters, the aridity or semiaridity of the soil, the other conditions peculiar to the State, fully warrant a special law designed to meet the situation and promote agricultural development." 54 Cong. Rec. S706 (statement of Sen. Pittman, reading a letter from the Secretary of the Interior).
 
 
 25
 If the aim of the land grants was to promote agriculture, it follows that the government meant to reserve minerals for other uses. In fact, full reservation of mineral rights was the policy in place at the time of the Act's passage.
 
 
 26
 In United States v. Union Oil Co. of California, 549 F.2d 1271, 1272 (9th Cir. 1977), we held that geothermal steam was reserved to the United States in grants made under the Stock-Raising Homestead Act (SRHA),[4] which was enacted only three years before the Pittman Act. We summarized the treatment of agricultural and mineral entries onto public land at the turn of the last century:
 
 
 27
 Prior to 1909, public lands were disposed of as either wholly mineral or wholly nonmineral in character. This practice led to inefficiencies and abuses. In 1906 and again in 1907, President Theodore Roosevelt pointed out that some public lands were useful for both agriculture and production of subsurface fuels, and that these two uses could best be served by separate disposition of the right to utilize the same land for each purpose.... To that end, the President recommended "enactment of such legislation as would provide for title to and development of the surface land as separate and distinct from the right to the underlying mineral fuels in regions where these may occur...."
 
 
 28
 Id. at 1274-75 (citation omitted) (quoting 41 Cong. Rec. 2806 (1907)). The President said that this "`system ... will encourage the separate and independent development of the surface lands for agricultural purposes and the extraction of the mineral fuels in such manner as will best meet the needs of the people.'" Id. at 1275 n. 8 (quoting 41 Cong. Rec. 2806).
 
 
 29
 In Watt v. Western Nuclear, Inc., 462 U.S. 36, 103 S.Ct. 2218, 76 L.Ed.2d 400 (1983), the Supreme Court considered the same legislative history when it decided that gravel was reserved to the United States in grants made under the SRHA. The Court relied heavily on the agricultural purpose of the SRHA and on the policy in place at the time of its enactment to sever the mineral estate from agricultural grants. The Court noted that, "[s]ince Congress intended to facilitate development, of both surface and subsurface resources, the determination of whether a particular substance is included in the surface estate or the mineral estate should be made in light of the use of the surface estate that Congress contemplated." Id. at 52, 103 S.Ct. 2218. The Court reasoned that,
 
 
 30
 [i]f we were to interpret the SRHA to convey gravel deposits to the farmers and stockmen who made entries under the Act, we would in effect be saying that Congress intended to make the exploitation of such deposits dependent solely upon the initiative of persons whose interests were known to lie elsewhere.
 
 
 31
 Id. at 56, 103 S.Ct. 2218. Thus, the Court agreed with our sentiment in Union Oil that "the mineral reservation is to be read broadly in light of the agricultural purpose of the grant itself, and in light of Congress's equally clear purpose to retain subsurface resources ... for separate disposition and development." Union Oil, 549 F.2d at 1279.
 
 
 32
 As we have said, Congress passed the SRHA in 1916, just three years before the Pittman Act. The floor debates surrounding the Pittman Act reveal that Congress intended the mineral reservation to serve the same purposes and have the same scope as the reservation under the SRHA. See H.R.Rep. No. 66-286, at 1 (1919) ("Section 8 of the bill contains the same reservations of minerals, with the facility for prospecting for and developing and mining such minerals as was provided in the [SRHA]."). Thus, congressional debates support the government's position, consistent with both Western Nuclear and Union Oil, that the mineral reservation in the Pittman Act is to be construed broadly.
 
 
 33
 C. Congressional Debate Concerning the Mineral Reservation
 
 
 34
 Congress — including Senator Pittman, the sponsor of the Act that bears his name — discussed at length the scope of the mineral reservation in the Pittman Act. See Williams, 140 I.B.L.A. at 304-13 (discussing the voluminous history of the Pittman Act); see also Kalvinskas v. Cal. Inst. of Tech., 96 F.3d 1305, 1309 (9th Cir.1996) (giving substantial weight to statements made by a bill's sponsor). Excerpts of the debates on this issue reveal that the mineral reservation was the product of a legislative compromise, without which the bill likely would not have passed.
 
 
 35
 During debates on the bill, Senator Thomas from Colorado moved for an amendment to remove the mineral reservation. 54 Cong. Rec. S707. Senator Pittman responded:
 
 
 36
 [B]efore the Senator does that, I trust that he will consider the matter for a minute. This bill, as it was originally prepared by me, did not contain that reservation. When a similar bill was introduced in the House of Representatives, at my request, it met with serious opposition on the very ground that it might be used for the purpose of grabbing mineral lands.
 
 
 37
 There was not the slightest chance on earth of passing such a bill through the House of Representatives if there was the slightest suspicion that the bill could be used for the purpose of acquiring mineral lands under the guise of obtaining agricultural lands. This reservation from all characters of agricultural entries is usual; and, without discussing the question of whether or not it is a good provision, I must say that it is the policy of Congress, as I see it, not to permit the acquisition of any character of minerals through any agricultural entry.
 
 
 38
 Id. (emphasis added).
 
 
 39
 Senator Pittman urged Senator Thomas to withdraw his amendment, for fear that its inclusion would "destroy the bill." Id. Senator Thomas continued to insist that patentees who prospect for water should be allowed to retain any minerals that they find. Id. Senator Pittman explained that "the Government by this bill reserves those minerals. It segregates them from the lands primarily granted for agricultural purposes." Id. Senator Thomas countered with the suggestion that the bill "should provide for the acquisition of complete-title to 640 acres as a reward for developing its subterranean water courses." Id. Senator Pittman replied:
 
 
 40
 I would favor that if I thought it would pass the bill; but I am confident that the inclusion of any such right in this grant would mean the destruction of the bill.
 
 
 41
 . . . .
 
 
 42
 ... [I]f the Senator's amendment carries[,] the bill will die; and I certainly would rather have what I can get for the people of our State than to stand here on a technical question trying to get more, with the probability of losing all.
 
 
 43
 
 Id.
 
 
 
 44
 The amendment was rejected, and the mineral reservation to the United States remained. This portion of the debate suggests that, without the reservation, the House would not have passed the bill. Senator Pittman did not limit the reservation. Rather, he spoke about it quite broadly. Emphasizing the agricultural nature of grants under the Act, Senator Pittman understood the bill to separate the mineral estate entirely — "any character of minerals" — and reserve it to the government. Finally, this piece of history is instructive because it appears that Senator Thomas' view of the mineral rights as a "reward" for water prospectors was not shared by a majority of the Congress.
 
 
 45
 Later, the issue of the mineral reservation resurfaced in the House. 58 Cong. Rec. H6469 (1919). Representative Blanton moved to "reserve the mineral rights of the Government." Id. This colloquy ensued:
 
 
 46
 Mr. KINKAID: They are reserved.
 
 
 47
 Mr. EVANS: They are already reserved.
 
 
 48
 Mr. BLANTON: The way I caught the bill it just spoke of the lands as nonmineral lands. Many lands classified as nonmineral and nonagricultural lands are, as a matter of fact, mineral and agricultural in some instances.
 
 
 49
 MR. TAYLOR: Those reservations are made now by general law. It is not necessary to put that in. You can not get oil land by homesteading nowadays.
 
 
 50
 Mr. BLANTON: It is all reserved?
 
 
 51
 Mr. TAYLOR: Yes.
 
 
 52
 Mr. BLANTON: These lands come under the general reservation?
 
 
 53
 Mr. TAYLOR: Yes.
 
 
 54
 Mr. BLANTON: These homesteads to-day do not contain any oil?
 
 
 55
 Mr. TAYLOR: When you get a homestead, you do not get any oil under it. The oil that may be underneath it is reserved.
 
 
 56
 . . . .
 
 
 57
 Mr. BLANTON: If the mineral rights are properly reserved, I have no objection.
 
 
 58
 Mr. EVANS: They are properly reserved.
 
 
 59
 Id. (emphasis added).
 
 
 60
 Again, the reservation was discussed without reference to any limitation. More importantly, this portion of the debate demonstrates that Congress was doubtless aware that the characterization of lands as "nonmineral" did not mean that those lands contained no minerals. Rather, it meant that the land was "chiefly valuable" for resources other than minerals. N. Pac. Ry. Co., 188 U.S. at 534, 23 S.Ct. 365; see also Union Oil, 549 F.2d at 1274-76 (discussing the history of characterizing public lands as "mineral" or "nonmineral").
 
 
 61
 The breadth of the reservation of mineral rights discussed in the legislative history supports the government's position: Congress did not intend to convey any mineral rights to patentees under the Act. However, neither the cases construing the SRHA, nor the floor debates on the Pittman Act, shed any light on whether the term "valuable" significantly limits the reservation. We move next to a discussion of the meaning of the term "valuable" in this context.
 
 
 62
 D. "Valuable minerals"
 
 
 63
 The SRHA's reservation does not contain the adjective "valuable." Instead, the SRHA simply reserves "all the coal and other minerals" to the United States. 43 U.S.C. § 299(a). As discussed, the SRHA's contemporaneous enactment and analogous purpose are instructive to a degree. But, because the SRHA does not use the modifier "valuable," we cannot conclude simply that the two reservations are coextensive. "[I]t is `a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" City of Los Angeles v. United States Dep't of Commerce, 307 F.3d 859, 870 (9th Cir.2002) (quoting TRW Inc. v. Andrews, 534 U.S. 19, 122 S.Ct. 441, 449, 151 L.Ed.2d 339 (2001)).
 
 
 64
 Contemporaneous government publications persuade us that, even if Congress intended the word "valuable" to limit the kinds of minerals reserved to the United States, sand and gravel were reserved. As early as 1914, five years before the Pittman Act was passed, the Department of the Interior devoted a full section of its annual publication, "Mineral Resources of the United States," to sand and gravel. The publication described the increase in production of sand and gravel since 1904, culminating in a reported yield of more than 79 million tons in 1914, which was valued at close to $24 million.[5] Department of the Interior, Mineral Resources of the United States 1914, at 271 (1916).
 
 
 65
 In succeeding years, the publication on mineral resources continued to analyze the sand and gravel industry. The government report for 1916 noted that "the production of sand and gravel was unprecedentedly large. All kinds of sands increased in total value.... From many parts of the country it was reported by producers that they could not get enough men to operate at the desired capacity or enough cars to meet their requirements." Mineral Resources of the United States 1916, at 327 (1919). In 1917, the production of sand and gravel in the United States was valued at more than $35 million.[6] Mineral Resources of the United States 1917, at 381 (1920). The Department of the Interior noted that "[o]nly four natural nonmetallic minerals produced in the United States ... show a greater annual value than that of sand and gravel." Id.
 
 
 66
 Even acknowledging that sand and gravel were valuable in some areas at the time of enactment, BedRoc contends, there could have been no viable market for the sand and gravel in this parcel at the time of this patent. BedRoc urges that we apply a site-specific analysis to determine whether a resource is "valuable." As support for that proposition, BedRoc argues that the term "valuable minerals" has the same meaning as the term "valuable mineral deposits" in the General Mining Act of 1872 (General Mining Law). That law determines how minerals are disposed of when they are discovered on public lands. 30 U.S.C. § 22 et seq.
 
 
 67
 According to BedRoc, Congress meant "valuable" to limit the reservation of rights to minerals that would be locatable under the General Mining Law. It follows, BedRoc urges, that we should determine whether sand and gravel are "valuable minerals" under the Pittman Act in the same way that we would determine whether a claimant had discovered "valuable mineral deposits" under the General Mining Law. Under the General Mining Law, we consider whether land contains "valuable mineral deposits" through application of the "prudent-man test." W. Nuclear, 462 U.S. at 58 n. 18, 103 S.Ct. 2218. In other words, we ask whether the challenged mineral deposit is the kind that would lead a prudent person to believe that a commercially viable mine could be operated with respect to that deposit. Id. Because that question is essentially factual, BedRoc argues that summary judgment was inappropriate.
 
 
 68
 We disagree with BedRoc's assertion that the two statutes refer to the same concept. The term "valuable" is used differently in the General Mining Law than in the Pittman Act. In the General Mining Law, the key phrase is "valuable mineral deposits." 30 U.S.C. § 22 (emphasis added). The adjective "valuable" does not modify the noun "minerals" as in the Pittman Act; rather, it modifies the noun "deposits," and the word "mineral" also modifies "deposits."
 
 
 69
 The two terms — "valuable minerals" and "valuable mineral deposits" — are not synonymous. Not every deposit of minerals — no matter how "valuable" the mineral itself may be — is sufficient to constitute a "valuable mineral deposit" under the General Mining Law. A gold or silver deposit undoubtedly is made up of "valuable minerals" but, unless the deposit is significant enough and accessible enough to justify the expense of extraction, it is not a "valuable mineral deposit" under the General Mining Law. See W. Nuclear, 462 U.S. at 58 n. 18, 103 S.Ct. 2218 (discussing the standard).[7]
 
 
 70
 Moreover, we disagree with BedRoc's contention that the question here is factual and site-specific. Rather, as in Western Nuclear, the question is a straightforward legal one regarding congressional intent as to the scope of the mineral reservation contained in the statute. Id. at 53-056, 103 S.Ct. 2218. When a mineral reservation is part of the statute itself, we follow the Supreme Court's lead and interpret that reservation using the usual tools of statutory construction. Id.; cf. United States v. Hess, 194 F.3d 1164, 1170-72 (10th Cir.1999) (construing the scope of a reservation in a patent issued under the Indian Reorganization Act (IRA) and distinguishing Western Nuclear on the ground that the IRA itself did not contain a mineral reservation).
 
 
 71
 The prudent-person test makes sense when trying to decide whether a claimant has located a vein or lode of minerals that is sufficient to satisfy the requirements for a mining claim on federal land. See 30 U.S.C. § 22. The concept of "value" defines the deposit and thus the commercial viability of the claim. However, it does not follow that the United States meant to impose this same constraint upon itself when it reserved "all the coal and other valuable minerals" under the Act. Had Congress intended to import the prudent-person test from the General Mining Law into the reservation of "valuable minerals" to the United States, it likely would have done so explicitly.
 
 CONCLUSION
 
 72
 Based on the text, purposes, and legislative history of the Pittman Act, we hold that sand and gravel are "valuable minerals" reserved to the United States. Accordingly, the judgment of the district court is AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 The closest codification to the time of the grant in this case is in the United States Code of Laws, January 3, 1935. 43 U.S.C. §§ 351-359 (repealed Aug. 11, 1964, Pub.L. No. 88-417, 78 Stat. 389 (subject to valid existing rights and obligations and without prejudice to pending claims)). We refer throughout this opinion to the sections of the Pittman Act as enacted
 
 
 [2]
 In 1996, BedRoc transferred 40 acres of the land to Western Elite, Inc. The parties agreed to amend the complaint to add Western Elite as a plaintiff in this action. Although Western Elite remains a plaintiff, for the sake of simplicity we refer to the plaintiffs collectively as BedRoc
 
 
 [3]
 There is a third plausible meaning of the "nonmineral" certification as well. The certification may have been intended to separate land expected to be usedprimarily for agriculture from land expected to be used primarily for extraction of minerals. See the discussion in the text below at pp. 1085-87 and 1088-89.
 
 
 [4]
 The mineral reservation in the SRHA states that patents under the Act "shall be subject to and contain a reservation to the United States of all the coal and other minerals in the lands so entered and patented." 43 U.S.C. § 299(a)
 
 
 [5]
 Something worth $24 million in 1914 would have been worth $423 million in 2001See John J. McCusker, "Comparing the Purchasing Power of Money in the United States (or Colonies) from 1665 to Any Other Year Including the Present," Economic History Services, 2001, available at http://www.eh.net/hmit/ppowerusd.
 
 
 [6]
 In 2001, this amount of sand and gravel was worth more than $570 millionSee id.
 
 
 [7]
 Even if we were to accept BedRoc's argument that "valuable minerals" and "valuable mineral deposits" were synonymous, it would not lead to the conclusion that BedRoc seeks. To the contrary, the General Mining Law would provide further support for our decision that sand and gravel were considered "valuable minerals" in the first half of the 20th Century. In 1955, the General Mining Law was amended specifically to exclude sand and gravel from substances locatable under those laws. That amendment provides:
 No deposit of common varieties of sand... [or] gravel ... shall be deemed a valuable mineral deposit within the meaning of the mining laws of the United States so as to give effective validity to any mining claim hereafter located under such mining laws... 30 U.S.C. § 611. In Western Nuclear, the Court found the 1955 amendment "highly pertinent" and interpreted it to mean that, before its adoption, sand and gravel were locatable under the mining laws. 462 U.S. at 57 & n. 15, 103 S.Ct. 2218. In other words, before 1955, a deposit of sand and gravel large enough to justify commercial extraction could have been a "valuable mineral deposit" under the General Mining Law. Because the Act in this case refers to "valuable minerals," the 1955 amendment removing sand and gravel deposits from the scope of "valuable mineral deposits" would seem to suggest that, before 1955, sand and gravel were considered "valuable minerals" that, in large enough "deposits," were locatable under the mining laws. See id. at 57-58, 103 S.Ct. 2218 (collecting cases).